ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| PR ASSET PORTFOLIO 2013-1 INTERNATIONAL, LLC<br><br>Parte Apelada<br><br><br>v.<br><br><br><br>MAVER, S.E. Y OTROS<br><br>Parte Apelante | TA2025AP00579<br><br>consolidado con<br><br>TA2025AP00580<br><br>y<br><br>TA2025AP00590 | *Apelación,* procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br><br>Caso Núm.:<br>K CD2010-1627<br><br><br>Sala: 604<br><br><br>Sobre:<br>Cobro de Dinero y Ejecución de Hipoteca |

Panel integrado por su presidenta, la Jueza Romero García, la Jueza Lotti Rodríguez y el Juez Monge Gómez.[1]

Monge Gómez, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 21 de mayo de 2026.

Comparecieron ante este Tribunal las partes apelantes, el Sr. Mikael José Del Valle y la Sra. Lissette Rodríguez Martínez (en adelante, "matrimonio Del Valle-Rodríguez"), mediante un recurso de apelación presentado el 23 de noviembre de 2025, bajo el alfanumérico TA2025AP00579; el Sr. Carl Roy Leyva Ramos, la Sra. Maribel Romero Merced y la Sociedad Legal de Bienes Gananciales compuesta por ambos (en adelante, "matrimonio Leyva Romero"), por vía de otro recurso de apelación presentado en esa misma fecha bajo el alfanumérico TA2025AP580 y el Sr. Veremundo Quiñones Allende, la Sra. Lydia Eloísa Quiñones Matos, el Sr. Carlos Veremundo Quiñones Allende, el Sr. Edmundo Louis Quiñones Castro y la Sra. Wilma Cecilia Quiñones Allende (en adelante, "Sucesión Quiñones"), (en adelante y en conjunto, los "Apelantes") a través de un recurso de apelación presentado el 24 de noviembre de 2025, bajo el caso núm. TA2025AP00590. Nos

---

[1] De conformidad con la OATA-26-0049, se designó al Hon. José Johel Monge Gómez en sustitución de la Hon. Laura I. Ortiz Flores, quien dejó de ejercer funciones como jueza del Tribunal de Apelaciones, efectivo el 1 de mayo de 2026.

solicitaron la revocación de la *Sentencia Parcial Enmendada* emitida por el Tribunal de Primera Instancia, Sala Superior de San Juan (en adelante, el "TPI"), el 20 de octubre de 2025, notificada y archivada en autos el 24 del mismo mes y año. Mediante el referido dictamen, el TPI declaró "Ha Lugar" la "**Solicitud de Sentencia Sumaria**" presentada por PR Asset Portfolio 2013-1 International, LLC (en adelante, "PRAPI").

Por los fundamentos que expondremos a continuación, *confirmamos* la *Sentencia* apelada.

**I.**

El presente caso tuvo su génesis el 6 de mayo de 2010, fecha en que el Banco Popular de Puerto Rico (en adelante, "BPPR") presentó una "**Demanda**" sobre cobro de dinero, ejecución simultánea de prendas e hipotecas y ejecución de garantías personales en contra de Maver, S.E. (en adelante, "Maver"), Blue Sea Village Inc. (en adelante, "Blue Sea"), JMC & Associates Corporation (en adelante, "JMC"), el matrimonio Del Valle-Rodríguez, el matrimonio Leyva-Romero, el Sr. José F. Massó Torrellas, la Sra. Sarina Maldonado Alfandari y la Sociedad Legal de Gananciales compuesta por ambos.

Mediante la misma, sostuvo que Maver le adeudaba la suma de $6,824,991.44, por lo que solicitó la ejecución de los documentos intitulados "**Collateral Assignment of Contracts, Rights and Documents**" y "**Collateral Assignment of Binding Option or Sale**", así como de la prenda y la hipoteca constituidas en garantía de la obligación. Posteriormente, el 9 de mayo de 2013, PRAPI presentó una "**Moción de Sustitución de Parte Demandante**" respecto a las causas de acción consignadas en la "**Demanda**", mediante la cual explicó que el BPPR permanecería compareciendo en defensa de las reconvenciones presentadas por los demandados. El TPI acogió dicha solicitud mediante *Orden* emitida el 31 de mayo de 2013.

Más adelante, el 8 de mayo de 2018, el Tribunal dictó *Sentencia Parcial* declarando "Ha Lugar" la "**Demanda**" en cuanto a Mayer y JMC. En particular, concluyó que existía una deuda líquida, vencida y exigible ascendente a $10,772,744.50, además de las sumas pactadas por concepto de costas, gastos y honorarios de abogado. Del mismo modo, dispuso que, si el producto de la venta

judicial resultaba insuficiente para satisfacer la totalidad de la deuda, los demandados responderían por cualquier balance insoluto.

En atención a dicho dictamen, se celebraron tres (3) subastas conforme a lo dispuesto en la *Sentencia Parcial*. Luego de la venta en pública subasta de una de las propiedades que garantizaban parcialmente la acreencia, se abonó a la deuda la suma de $8,000,000.00, permaneciendo así una deficiencia pendiente de pago. Más adelante, el 30 de agosto de 2021, el foro primario emitió una *Orden de Confirmación de Adjudicación o Venta Judicial*, notificada el 17 de octubre de 2021.

Posteriormente, el 14 de julio de 2023, PRAPI presentó una "**Solicitud de Sentencia Sumaria**", mediante la cual sostuvo que aún permanecía pendiente de satisfacción, por parte de los garantizadores de la deuda, una deficiencia ascendente a aproximadamente $7,158,672.00, suma que continuaba acumulando intereses diarios, además de los $1,600,000.00 pactados por concepto de costas, gastos y honorarios de abogado. Asimismo, argumentó que, mediante la *Sentencia Parcial*, el Tribunal había determinado que el matrimonio Del Valle-Rodríguez y el matrimonio Leyva-Romero suscribieron un documento titulado "**Garantía Ilimitada y Continua**", a través del cual garantizaron personalmente el préstamo concedido a Mayer. A tenor con ello, solicitó que se declarara "Ha Lugar" su petición.

Por su parte, el 7 de septiembre de 2023, el matrimonio Leyva-Romero presentó su "**Oposición a Solicitud de Sentencia Sumaria de PRAPI y Solicitud de Sentencia Sumaria**", mediante la cual alegó que los garantizadores solidarios no respondían por la deficiencia resultante de la venta judicial, puesto que el pagaré que garantizaba la deuda había sido cancelado previo a la reclamación de dicha deficiencia mediante la solicitud de sentencia sumaria presentada por PRAPI. Específicamente, aludieron al proceso de venta judicial y posterior confirmación por parte del TPI.

Igualmente, el 15 de septiembre de 2023, la Sra. Lissette Rodríguez Martínez presentó una "**Moción Uniéndonos a Oposición de Solicitud de Sentencia Sumaria**", mediante la cual se unió a los planteamientos esbozados en la *Oposición* presentada por el matrimonio Leyva-Romero. En síntesis, sostuvo que dichos argumentos constituían la realidad fáctica y jurídica aplicable al caso de autos. Añadió que la Escritura Núm. 13 sobre Cancelación de Hipoteca y Pagaré

Hipotecario establecía que el pago recibido producto de la venta judicial extinguió la obligación principal, razón por la cual la deuda quedó cancelada. A su vez, el 1 de octubre de 2023, el Sr. Mikael Del Valle Rodríguez presentó una "**Moción Asumiendo Representación Legal y en Torno a Solicitud de Disposición Sumaria**". A través de dicho escrito, rechazó toda alegación dirigida a sostener que el matrimonio Del Valle-Rodríguez garantizaba personalmente la referida deuda, al afirmar que la obligación había sido cancelada el 28 de octubre de 2021.

Finalmente, el 18 de julio de 2024, el TPI dictó *Sentencia* declarando "Ha Lugar" la "**Solicitud de Sentencia Sumaria**" presentada por PRAPI. En consecuencia, condenó solidariamente al matrimonio Leyva-Romero y al matrimonio Del Valle-Rodríguez o a sus respectivos sucesores o herederos, al pago de la deuda de Mayer, respecto de la cual fungían como garantizadores, ascendente a $8,758,672.00, más los intereses acumulados hasta su total satisfacción. Inconformes con dicha determinación, los Apelantes presentaron sus respectivas mociones de recosideración.

Posteriormente, el foro de instancia emitió una *Sentencia Parcial Enmendada Nunc Pro Tunc*, mediante la cual reiteró que el producto de la venta judicial del colateral, específicamente la finca número 8497, ascendente a $8,000,000.00, no fue suficiente para satisfacer la totalidad de la deuda. En consecuencia, concluyó que los demandados mantenían una obligación pendiente con PRAPI por la suma aproximada de $8,758,672.00, cantidad que continuaba acumulando intereses diarios y respecto de la cual los garantizadores venían obligados a responder. El 20 de octubre de 2025, el TPI emitió una *Resolución* mediante la cual declaró "No Ha Lugar" las solicitudes de reconsideración interpuestas por los Apelantes.

Aun inconforme con lo anteriormente resuelto, los Apelantes acudieron ante este tribunal intermedio mediante los recursos de epígrafe. En el caso núm. TA2025AP00579, el matrimonio Del Valle-Rodríguez alegó que el TPI cometió los siguientes errores:

PRIMER ERROR: ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL NEGARSE A RECONSIDERAR SU DETERMINACIÓN, AUN CUANDO PRAPI HABÍA DESISTIDO DE SUS CAUSAS DE ACCIÓN CONTRA LA SUCESIÓN DEL VALLE DESDE EL AÑO 2015, DEJANDO AL FORO RECURRIDO SIN JURISDICCIÓN SOBRE LA PERSONA DE LA PARTE APELANTE Y

VULNERANDO SU DERECHO CONSTITUCIONAL AL DEBIDO PROCESO DE LEY.

SEGUNDO ERROR: ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL DICTAR SENTENCIA SUMARIA A FAVOR DE PRAPI BASÁNDOSE EN UNA ALEGADA "GARANTÍA ILIMITADA", AUN CUANDO LA OBLIGACIÓN PRINCIPAL QUE DICHA GARANTÍA PRETENDÍA ASEGURAR HABÍA SIDO LEGALMENTE EXTINGUIDA MEDIANTE LA EJECUCIÓN Y ADJUDICACIÓN DEL COLATERAL.

TERCER ERROR: ERRÓ EL FORO DE INSTANCIA AL INTERPRETAR LA "GARANTÍA ILIMITADA Y CONTINUA" COMO SI FUERA UNA RENUNCIA GENERALIZADA A TODAS LAS PROTECCIONES DEL FIADOR, IGNORANDO QUE SE TRATA DE UN CONTRATO DE ADHESIÓN REDACTADO UNILATERALMENTE POR EL ACREEDOR Y SUJETO A INTERPRETACIÓN RESTRICTIVA.

En el caso núm. TA2025AP00580, el matrimonio Leyva-Romero expuso que el foro de instancia cometió los siguientes errores:

PRIMER ERROR: ERRÓ EL TPI AL DICTAR SENTENCIA PARCIAL EN FAVOR DE PRAPI SIN ADJUDICAR LA RECONVENCIÓN PRESENTADA POR LOS APELANTES LEYVA-ROMERO, LA CUAL ERA ESENCIAL PARA ADJUDICAR LA CONTROVERSIA.

SEGUNDO ERROR: ERRÓ EL TPI AL NO EMITIR DETERMINACIONES DE HECHOS EN CONTROVERSIA QUE IMPIDEN DISPONER DE LA SENTENCIA SUMARIA PRESENTADA POR LOS APELANTES LEYVA-ROMERO, LA CUAL QUEDÓ SOMETIDA ANTE LA CONSIDERACIÓN DEL TPI.

TERCER ERROR: ERRÓ EL TPI AL NO ACOGER LA MOCIÓN POR FALTA DE PARTE INDISPENSABLE Y AL APLICAR ERRÓNEAMENTE LA DOCTRINA DE ACUMULACIÓN NECESARIA DE PARTES.

CUARTO ERROR: ERRÓ EL TPI AL VALIDAR LA CANCELACIÓN DEL PAGARÉ HIPOTECARIO, LO CUAL EXTINGUE LA OBLIGACIÓN PRINCIPAL E IMPEDÍA CUALQUIER RECLAMACIÓN ADICIONAL.

QUINTO ERROR: EL TPI ERRÓ AL NO CONSIDERAR LA APLICACIÓN DE LA DOCTRINA REBUS SIC STANTIBUS Y LA BUENA FE CONTRACTUAL ANTE EL INCUMPLIMIENTO PREVIO DEL ACREEDOR (BPPR).

Por su parte, en el caso núm. TA2025AP00590, la Sucesión Quiñones argumentó que el foro a quo cometió los siguientes errores:

EL TPI INCURRIÓ EN ERROR MANIFIESTO Y ABUSO DE DISCRECIÓN AL DICTAR UNA SENTENCIA NULA SIN LA FAMILIA QUIÑONES, SUCESORES DEL VERDADERO ACREEDOR EN PRIMER RANGO DE LA PROPIEDAD HIPOTECADA, A QUIENES SE LES IMPIDIÓ DEFENDER SU INTERÉS PROPIETARIO SOBRE ÉSTA, OBVIANDO EL CARÁCTER IRRENUNCIABLE DE LA DEFENSA DE FALTA DE PARTE INDISPENSABLE, SOBRE LA CUAL NO SE PODÍA ADJUDICAR LA CONTROVERSIA.

El 23 de enero de 2026, PRAPI compareció mediante escrito intitulado "**Oposición a Apelaciones Consolidadas**".

Con el beneficio de la comparecencia de ambas partes, procedemos a resolver.

## II.

## A.

El propósito de las Reglas de Procedimiento Civil es proveerles a las partes que acuden a un tribunal una "solución justa, rápida y económica de todo procedimiento". Batista Valentín v. Sucn. Batista Valentín, 2025 TSPR 93; 216 DPR ___ (2025). Así, la Regla 36 del mencionado cuerpo procesal atiende lo referente al mecanismo de sentencia sumaria. A la luz de sus disposiciones, se dictará sentencia si de "las alegaciones, deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas si las hay, u otra evidencia demuestran que no hay controversia real sustancial en cuanto a algún hecho esencial y pertinente, y que como cuestión de derecho el tribunal debe dictar la sentencia sumaria a favor de la parte promovente". Regla 36.3 de Procedimiento Civil, 32 LPRA, Ap. V, R. 36.3; Negrón Castro y otros v. Soler Bernardini y otros, 2025 TSPR 96; 216 DPR ____ (2025).

En ese sentido, se considera un hecho material o esencial, "aquel que pueda afectar el resultado de la reclamación de acuerdo con el derecho sustantivo aplicable". Oriental Bank v. Caballero García, 212 DPR 671, 679 (2023). Cabe señalar que el juzgador no está limitado a los hechos o documentos que se produzcan en la solicitud, sino que puede tomar en consideración todos los documentos que obren en el expediente del tribunal. S.L.G. Szendrey-Ramos v. Consejo Titulares, 184 DPR 133, 167 (2011).

Solamente se dictará sentencia sumaria en casos en los cuales el tribunal cuente con la verdad de todos los hechos necesarios para resolver la controversia y surja claramente que la parte promovida por el recurso no prevalecerá. Oriental Bank v. Caballero García, *supra*, pág. 678. Sin embargo, el tribunal no podrá dictar sentencia sumaria cuando: (1) existan hechos materiales y esenciales controvertidos; (2) haya alegaciones afirmativas en la Demanda que no han sido refutadas; (3) surja de los propios documentos que acompañan la moción una

controversia real sobre algún hecho material; o (4) la moción no procede como cuestión de derecho. S.L.G. Szendrey-Ramos v. Consejo de Titulares, *supra*, pág. 168. Para prevalecer, el promovente de este recurso debe presentar una moción fundamentada en declaraciones juradas o en cualquier evidencia que demuestre la inexistencia de una controversia sustancial de hechos materiales sobre la totalidad o parte de la reclamación. Oriental Bank v. Caballero García, *supra*, pág. 678.

Por su parte, la parte promovida por una moción de sentencia sumaria debe señalar y refutar los hechos materiales que entiende están en controversia y que son constitutivos de la causa de acción del demandante. Rosado Reyes v. Global Healthcare, 205 DPR 796, 808 (2020); Oriental Bank v. Perapi et al., 192 DPR 7, 25-26 (2014). Así, la parte que se opone a que se dicte sentencia sumaria en su contra debe controvertir la prueba presentada y no cruzarse de brazos. ELA v. Cole, 164 DPR 608, 626 (2005). No puede descansar en meras afirmaciones contenidas en sus alegaciones ni tomar una actitud pasiva, sino que está obligada a presentar contradeclaraciones juradas y/o contradocumentos que pongan en controversia los hechos presentados por el promovente. Oriental Bank v. Caballero García, *supra*, pág. 8; Roldán Flores v. M. Cuebas *et al.*, 199 DPR 664, 677 (2018).

Adicionalmente, en León Torres v. Rivera Lebrón, 204 DPR 20, 47 (2020), el Tribunal Supremo resolvió que ninguna de las partes en un pleito puede enmendar sus alegaciones a través de la presentación de una solicitud de sentencia sumaria o su oposición. Así que, según lo expresa el propio tribunal, "la parte que se opone a una solicitud de sentencia sumaria no puede traer en su oposición, de manera colateral, defensas o reclamaciones nuevas ajenas a los hechos consignados en sus alegaciones, según consten en el expediente del tribunal al momento en que se sometió la moción dispositiva en cuestión". Íd., pág. 54.

Según las directrices pautadas por nuestro más alto foro, una vez se presenta la solicitud de sentencia sumaria y su oposición, el tribunal deberá: (1) analizar todos los documentos incluidos en ambas mociones y aquellos que obren en el expediente del tribunal; y (2) determinar si la parte opositora controvirtió algún hecho material o si hay alegaciones en la demanda que no han sido refutadas en forma alguna por los documentos. Abrams Rivera v. ELA, DTOP y otros, 178 DPR 914, 932 (2010).

Al examinar la procedencia de una moción que solicita disponer de un caso sumariamente, el tribunal no tiene que sopesar la evidencia y determinar la veracidad de la materia, sino que su función estriba en determinar la existencia o no de una controversia genuina, la cual amerite ser dilucidada en un juicio plenario. JADM v. Centro Comercial Plaza Carolina, 132 DPR 785, 802-803 (1983). Además de que "[t]oda inferencia razonable que se realice a base de los hechos y documentos presentados, en apoyo y en oposición a la solicitud de que se dicte sentencia sumariamente, debe tomarse desde el punto de vista más favorable al que se opone a ésta". ELA v. Cole, 164 DPR 608, 626 (2005).

En el caso de revisar la determinación del TPI respecto a una sentencia sumaria, este foro apelativo se encuentra en la misma posición que el foro de instancia para evaluar su procedencia. Rivera Matos *et al.* v. Triple-S *et al.*, 204 DPR 1010, 1025 (2020); Meléndez González *et al.* v. M. Cuebas, 193 DPR 100, 118 (2015). La revisión que realice el foro apelativo deberá ser *de novo* y estará limitada a solamente adjudicar los documentos presentados en el foro apelado. Vera v. Dr. Bravo, 161 DPR 308, 335 (2004)*.* De modo que las partes que recurren a un foro apelativo no pueden litigar asuntos que no fueron traídos a la atención del foro de instancia. Íd. En adición a esta limitación, se ha aclarado que al foro apelativo le está vedado adjudicar los hechos materiales esenciales en disputa, porque dicha tarea le corresponde al foro de primera instancia. Íd. págs. 334-335.

En Meléndez González *et al.* v. M. Cuebas, *supra*, nuestro más Alto Foro delimitó los pasos del proceso a seguir para la revisión de la sentencia sumaria por parte de este foro revisor, el cual consiste de: (1) examinar *de novo* el expediente y aplicar los criterios que la Regla 36 de Procedimiento Civil, *supra*, y la jurisprudencia le exigen al foro primario; (2) revisar que tanto la moción de sentencia sumaria como su oposición cumplan con los requisitos de forma codificados en la referida Regla 36, *supra*; (3) revisar si en realidad existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, 32 LPRA Ap. V, R. 36.4, de exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles son incontrovertibles; (4) y, de encontrar que los hechos materiales realmente son

incontrovertidos, debe proceder a revisar *de novo* si el Tribunal de Primera Instancia aplicó correctamente el derecho a la controversia. Íd., págs. 118-119.

Conviene desde ahora destacar que el Tribunal Supremo también ha expresado que es desaconsejable utilizar la moción de sentencia sumaria en casos en donde existe controversia sobre elementos subjetivos, de intención, propósitos mentales o negligencia. Ramos Pérez v. Univisión de P.R, 178 DPR 200, 2019 (2010); Carpets & Rugs v. Tropical Reps, 175 DPR 615, 638 (2009). No obstante, "cuando de los documentos a ser considerados en la solicitud de sentencia sumaria surge que no existe controversia en cuanto a los hechos materiales" nada impide que se utilice la sentencia sumaria en casos donde existen elementos subjetivos o de intención. Ramos Pérez v. Univisión de P.R, *supra*, pág. 219.

**B.**

La Regla 16 de las de Procedimiento Civil regula lo pertinente en cuanto a partes indispensables en los casos. La misma dispone:

> Las personas que tuvieren un interés común sin cuya presencia no pueda adjudicarse la controversia, se harán partes y se acumularán como demandantes o demandadas según corresponda. Cuando una persona que deba unirse como demandante rehusare hacerlo, podrá unirse como demandada. 32 LPRA Ap. V, R. 16.

El propósito de la precitada regla es proteger a las personas ausentes de los efectos perjudiciales que pudiera tener la resolución del caso sin la presencia de ellos y evitar multiplicidad de pleitos, para así emitir una determinación completa. FCPR v. ELA *et al*., 211 DPR 521 (2023). La importancia de tal inclusión es de tal magnitud que nuestro más Alto Foro ha expresado que el planteamiento de falta de parte indispensable puede ser presentado por primera vez en apelación para ser considerado por el foro apelativo. RPR & BJJ Ex Parte, 207 DPR 389, 407, (2021). El "interés común" al que se refiere no es a "cualquier interés en el pleito, sino que tiene que ser un interés real e inmediato, no especulativo ni a futuro, que impida la confección de un remedio adecuado porque podría afectar o destruir radicalmente los derechos de esa parte ausente". Íd., pág. 408.

El Tribunal Supremo ha definido a una parte indispensable como aquella de la que no se puede prescindir, pues, sin su presencia las cuestiones litigiosas no pueden ser adjudicadas correctamente, ya que sus derechos quedarían afectados por una determinación judicial. RPR & BJJ Ex Parte, *supra*, pág. 407. Es tarea del

tribunal determinar la necesidad de acumular a una parte por ser indispensable, pues lo fundamental es establecer "si el tribunal puede hacer justicia y conceder un remedio final y completo [a las partes presentes] sin afectar los intereses [de la parte] ausente". Íd., págs. 408-409 (citando a Pérez Rosa v. Morales Rosado, 172 DPR 216, 223 (2007)). Por ende, de concluir que dicha parte es necesaria en el pleito y no haberla incluido, el tribunal carece de jurisdicción y la sentencia que se emita sin su presencia sería nula. Watchtower Bible *et al.* v. Mun. Dorado I, 192 DPR 73, 118 (2014).

## C.[2]

Es pilar fundamental de nuestro acervo contractual puertorriqueño el principio de la libertad de contratación. Arthur Young & Co. v. Vega III, 136 DPR 157, 169 (1994). A base de éste, las partes contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que éstas no sean contrarias a la ley, a la moral o al orden público. Art. 1207 del Código Civil de 1930, 31 LPRA sec. 3372. Así, se posibilita que las partes puedan contratar cuando quieran, como quieran y con quien quieran. J. Puig Brutau, Fundamentos de Derecho Civil: Doctrina General del Contrato, 3ra ed., Barcelona, Ed. Bosch, 1988, T. II, Vol. I, pág. 5.

Es norma sólidamente establecida en nuestra jurisdicción que el contrato tiene fuerza de ley entre las partes, por lo que desde el momento de su perfeccionamiento cada contratante se obliga, "no sólo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que según su naturaleza sean conformes a la buena fe, al uso y a la ley". Art. 1210 del Código Civil de 1930, 31 LPRA sec. 3375. Es por ello que existe un contrato desde que una o varias personas consienten en obligarse a dar alguna cosa o a prestar algún servicio. Art. 1206 del Código Civil de 1930, 31 LPRA sec. 3371.

En ese sentido, un contrato es vinculante desde que concurren los siguientes requisitos: (a) consentimiento de los contratantes; (b) objeto cierto que sea materia

---

[2] Somos conscientes de que mediante la Ley Núm. 55-2020, según enmendada, se adoptó el "Código Civil de 2020" y se derogó el Código Civil de 1930. Sin embargo, el Artículo 1812 del Código Civil de 2020 dispone que: "Los actos y contratos celebrados bajo el régimen de la legislación anterior y que son válidos con arreglo a ella, surten todos sus efectos según la misma, con las limitaciones establecidas en este Código". 31 LPRA sec. 11717. Por tanto, para propósitos de la adjudicación de la controversia que nos ocupa, utilizaremos las disposiciones del Código Civil derogado y su jurisprudencia interpretativa.

del contrato y (c) causa de la obligación que se establezca. Art. 1213 del Código Civil de 1930, 31 LPRA sec. 3391; Díaz Ayala *et al.* v. E.L.A., 153 DPR 675, 690-691 (2001). Consecuentemente, "[l]os contratos serán obligatorios, cualquiera que sea la forma en que se hayan celebrado, siempre que en ellos concurran las condiciones esenciales para su validez". Art. 1230 del Código Civil de 1930, 31 LPRA sec. 3451.

Ahora bien, cuando el contrato es válido, pero uno de los contratantes que se obligó recíprocamente incumple con su parte del pacto, el perjudicado podrá reclamar el cumplimiento del contrato o la resolución de la obligación, con el resarcimiento de daños y abono de intereses en ambos casos. Art. 1077 del Código Civil de 1930, 31 LPRA sec. 3052. El incumplimiento de una obligación recíproca conlleva un efecto resolutorio siempre que la obligación incumplida sea una esencial o que su cumplimento constituya el motivo del contrato para la otra parte. NECA Mortg. Corp. v. A&W Dev. S.E., 137 DPR 860, 875 (1995).

> La exigencia de que la obligación incumplida sea la principal responde a un interés superior, acorde con el principio de la buena fe, de evitar el abuso en el ejercicio de las acciones resolutorias, promover el cumplimiento de los contratos e impedir que, a través de una infracción menor, una de las partes trate de liberarse del vínculo porque ya no le conviene o no le interesa. Los tribunales deberán tener bien presente que el Art. 1077 del Código Civil, *supra*, dispone que el tribunal decretará la resolución si no existen causas justificadas que le autoricen para señalar un plazo. Íd., págs. 875-876 (cita omitida).

Por su parte, un contrato se considera celebrado por adhesión cuando el aceptante se ve obligado a aceptar los términos previamente establecidos. 31 LPRA sec. 9802. Por eso, ante este tipo de acuerdo, los consumidores carecen de poder de negociación y únicamente pueden decidir entre aceptarlo tal como está o rechazarlo por completo. Suárez Figueroa v. Sabanera Real, Inc., 173 DPR 694, 712 (2008).

A pesar de que en nuestro ordenamiento legal se ha reconocido la legitimidad de los contratos de adhesión, se ha especificado que cualquier duda que emane de su contenido deberá resolverse en beneficio de la parte que no participó en su elaboración. 31 LPRA sec. 9802; Echandi Otero v. Stewart Title, 174 DPR 355, 370 (2008); Rodríguez de Oller v. T.O.L.I.C., 171 DPR 293, 304 (2007). Así pues, son especialmente anulables en los contratos celebrados por adhesión

las cláusulas que no se redactan de manera clara, completa y fácilmente legible, y aquellas que limitan al adherente la interposición de acciones. 31 LPRA sec. 9803.

No obstante, esta regla de interpretación no aplica si el contrato tiene un texto claro y sin ambigüedades. Quiñones López v. Manzano Pozas, 141 DPR 139, 155 (1996). Es decir, solo en caso de que el contrato presente clausulas obscuras, vagas o confusas se activa la norma de interpretación del Artículo 1248 del Código Civil, 31 LPRA sec. 9802, que dispone que cualquier duda debe resolverse a favor de la persona que se vio precisada a aceptar su contenido. Zequeira v. CRUV, 83 DPR 878, 880 (1961).

De no existir ambigüedad en el contrato de adhesión, éste debe ser comprendido según sus términos establecidos. Coop. Sabaneña v. Casiano Rivera, 184 DPR 169, 177 (2011). Esta norma de interpretación no tiene el efecto de forzar a los tribunales a interpretar a favor de la parte que no redactó el contrato una cláusula que, de manera clara y sin ambigüedad, respalda al redactor. López v. Atlantic Southern Ins. Co., 158 DPR 562, 569 (2003).

Ahora bien, los tribunales tenemos la ineludible labor de velar por el cumplimiento específico de toda obligación contractual, sin relevar a las partes contratantes del cumplimiento de ésta. Siempre velando porque el contrato esté enmarcado en el ámbito de lo legítimo y no adolezca de vicio alguno. Cervecería Corona v. Commonwealth Ins. Co., 115 DPR 345, 351 (1984); Olazábal v. U.S. Fidelity,etc. 103 DPR 448, 462 (1975).

**D.**

Los instrumentos negociables "son documentos en los que se plasma el derecho a cobrar una suma de dinero y a los que el ordenamiento jurídico les confiere una especial habilidad para circular". COSSEC, *et al.* v. González López, *et al.*, 179 DPR 793, 799 (2010) (citando a M.R. Garay Auban, Derecho Cambiario, Ponce, Ed. Revista de Derecho Puertorriqueño, 1999, pág. 1). El Art. 2-104 de la Ley Núm. 208-1995, según enmendada, conocida como la "Ley de Transacciones Comerciales de Puerto Rico", define un "instrumento negociable" como una promesa u orden incondicional de pago de una cantidad específica de dinero si es: (1) pagadero al portador o a la orden, al momento de ser emitido o cuando el tenedor adviene en posesión de éste; (2) pagadero en una fecha específica o a la

presentación; y (3) si no especifica otra instrucción o compromiso más que el de pago del dinero aun cuando puede incluir el compromiso de dar o mantener colateral que garantice el pago, una autorización al tenedor para admitir sentencia o liquidar y disponer del colateral, o una renuncia al beneficio de cualquier ley que le conceda protección al deudor. 19 LPRA sec. 504. El documento, claro está, debe constar por escrito y estar firmado. Santos García v. Banco Popular, 172 DPR 759, 769 (2007).

Uno de los instrumentos negociables modernos que más se utiliza es el pagaré. COSSEC, *et al.* v. González López, *et al.*, *supra*, pág. 799. El instrumento negociable es un pagaré si "es una promesa". 19 LPRA sec. 504 (e). Una promesa es "un compromiso escrito de pagar dinero suscrito por la persona que se obliga a pagar". 19 LPRA sec. 503 (a)(9). El estatuto reconoce la existencia de diversos tipos de pagarés, lo que dependerá del momento en que resultan exigibles. Westernbank v. Registradora, 174 DPR 779, 786 (2008). Define los pagarés vencederos a la presentación y los pagaderos en fecha específica. 19 LPRA sec. 508. La orden o promesa será pagadera a la presentación si: "(1) especifica que es pagadera a la presentación o a la vista o de otra forma indica que es pagadera cuando el tenedor lo exija, o (2) no especifica ninguna fecha de pago". 19 LPRA sec. 508 (a). Este tipo de instrumento se considera vencido desde que su tenedor exige el pago de la obligación. Íd. Mientras que aquéllos de fecha específica son pagaderos una vez ha transcurrido un periodo de tiempo específico desde su presentación o aceptación. Íd.

**E.**

Según ha expresado nuestro Tribunal Supremo, en los tiempos medievales, si ocurría un cambio significativo en la situación existente o contemplada por las partes al contratar, el obligado tenía la oportunidad de resolver el contrato si este se volvía demasiado oneroso. Casera Foods Inc., v. ELA, 108 DPR 850, 853 (1979). Esto es conocido como la doctrina de revisibilidad del contrato o *rebus sic stantibus*. Esta doctrina podría aplicarse de manera excepcional a contratos de ejecución sucesiva y prolongada, en los que se produzca un cambio de circunstancias, independiente de la acción o voluntad de las partes, que vuelva excesivamente gravosa la ejecución del acuerdo o transforme el contrato en uno injusto. Íd., pág.

855 (citando a Castán, Derecho Civil Español, Común y Foral, Tomo 3, pág. 544 (1974))

De acuerdo con lo anterior, según el principio de equidad, la referida doctrina suaviza la rigidez del principio de *pacta sunt servanda* y permite al tribunal intervenir en contratos donde forzar su cumplimiento específico podría resultar injusto o contrario a la buena fe. BBPR v. Sucn, Talavera, 174 DPR 686, 695 (2008). Sin embargo, es crucial recordar que la aplicación de esta doctrina es una excepción reservada para escenarios muy particulares y extraordinarios, lo cual demanda un cuidadoso y prudente discernimiento judicial de moderación. Mun. de Ponce v. A.C. *et. al.*, 153 DPR 1, 37 (2000).

Nuestro más alto foro ha delimitado la discreción judicial en cuanto a la aplicabilidad de la doctrina *rebus sic stantibus* al establecer los siete (7) criterios que deben cumplirse para determinar si puede aplicarse como fuente de remedios. Casera Foods, Inc. v. E.L.A., *supra*, pág. 856. Estos son los siguientes: (1) imprevisibilidad, (2) una agravación de las condiciones de la prestación, (3) que el riesgo no haya sido el factor decisivo para la celebración del contrato, (4) que ninguna de las partes haya incurrido en dolo, (5) que el contrato sea de tracto sucesivo o este referido a un momento futuro; (6) que el cambio en las circunstancias ocurra posterior a la celebración del contrato y que (7) que haya una solicitud por parte de la persona interesada. Íd.

En la interpretación de la referida doctrina y los criterios que se deben tomar en consideración para evaluar su aplicabilidad, nuestro Tribunal Supremo estableció en Oriental Bank v. Perapi *et al.*, 192 DPR 7 (2014), que la crisis económica del país, por si sola y sin más explicación, no constituye una circunstancia imprevisible que justifique invocar y aplicar la cláusula *rebus sic stantibus* como defensa contra el principio *pacta sunt servanda* en el ámbito contractual. Íd., pág. 11. En este caso, Oriental Bank inicio una acción para el cobro y ejecución de una hipoteca debido al incumplimiento de los deudores en un préstamo comercial. Posteriormente, Oriental Bank solicitó la disposición sumaria del caso, a la cual los deudores se opusieron alegando como defensa, la crisis económica que afectaba a Puerto Rico. Amparados en ello, argumentaron que la obligación reclamada no era exigible, según los términos acordados e invocaron la

doctrina *rebus sic stantibus*. Ante esta situación, el Tribunal Supremo declaró que las crisis económicas son eventos cíclicos y, por lo tanto, previsibles. Íd. pág. 27. Por consiguiente, expresó que ello no puede servir como fundamento para que los tribunales modifiquen los términos de un contrato mediante la doctrina *rebus sic stantibus*. Íd., pág. 28.

En el referido caso, el Tribunal razonó que resolver lo contrario implicaría convertir la excepción en norma, lo que resultaría en caos e incertidumbre en las relaciones contractuales de nuestra jurisdicción. Íd. Además, subrayó que el efecto sería aún más devastador en los contratos de préstamos comerciales con garantías hipotecarias y prendarias, ya que esto significaría condenar al sistema financiero de Puerto Rico y provocar un caos económico sin precedentes. Íd.

En resumen, la aplicación de la doctrina *rebus sic stantibus* es una excepción al principio de *pacta sunt servanda* consagrado en el antiguo Artículo 1044 del Código Civil, 31 LPRA sec. 2994, (hoy Artículo 1233 del Código Civil vigente, 31 LPRA sec. 9754), que indica claramente que los contratos tienen fuerza de ley entre las partes y deben ser cumplidos según sus términos. Íd., pág. 15. Por lo tanto, es imperativo tener presente que la aplicación del principio de *rebus sic stantibus*, el cual exime a una parte del cumplimiento de los términos estipulados en un contrato, representa un remedio excepcional reservado únicamente para situaciones extraordinarias. Oriental Bank v. Perapi *et al.*, *supra*, pág. 19.

**F.**

La hipoteca constituye un derecho real de garantía cuyo propósito es asegurar el cumplimiento de una obligación pecuniaria. Esta posee carácter accesorio e indivisible, requiere constitución registral y recae directamente sobre bienes inmuebles ajenos y susceptibles de enajenación, los cuales continúan bajo la posesión de su propietario. Westernbank v. Registradora, 174 DPR 779, 784 (2008); R&G v. Registradora, 162 DPR 602, 607 (2004). Asimismo, se distingue por su carácter accesorio, ya que su existencia y subsistencia dependen directamente de la obligación principal garantizada, quedando supeditada a esta tanto en cuanto a su vigencia como a su extinción. Westernbank v. Registradora, *supra*, págs. 784-785. En otras palabras, la hipoteca mantiene su eficacia jurídica mientras permanezca vigente el crédito que garantiza. Íd., pág. 785.

En consecuencia, la hipoteca grava de manera directa e inmediata los bienes y derechos sobre los cuales recae, independientemente de quién ostente su posesión o titularidad, con el fin de asegurar el cumplimiento de la obligación garantizada. 30 LPRA sec. 5043. De igual forma, el contrato de hipoteca presupone la coexistencia de dos figuras jurídicas fundamentales: (1) la obligación principal y (2) la garantía hipotecaria constituida en beneficio del acreedor de dicha obligación. R&G y. Registradora, supra, pág. 607. Por consiguiente, la existencia de una hipoteca está inexorablemente ligada a una obligación garantizada. Íd.

El Artículo 1756 del derogado Código Civil establecía que, para la válida constitución de una hipoteca, debían concurrir varios requisitos esenciales, a saber: (1) que esta sea otorgada para garantizar el cumplimiento de una obligación principal; (2) que el bien dado en garantía pertenezca en propiedad a quien lo grava; y (3) que la persona que constituya la prenda o hipoteca tenga libre disposición de sus bienes o, en su defecto, cuente con autorización legal para ello. 31 LPRA sec. 5001. Además, nuestro ordenamiento exige que la hipoteca conste mediante escritura pública y que dicha escritura sea inscrita en el Registro de la Propiedad para que quede válidamente constituida. Vázquez Santiago v. Registrador, 137 DPR 384, 388 (1994).

En consecuencia, una vez la obligación principal garantizada mediante hipoteca adviene vencida, el ordenamiento jurídico reconoce al acreedor hipotecario diversos mecanismos procesales para procurar el cobro de su acreencia y hacer efectiva la garantía real constituida a su favor. Atanacia Corp. v. J. M. Saldaña, Inc., 133 DPR 284, 292 (1993). Entre dichos mecanismos se encuentran: (1) la ejecución de hipoteca y (2) la acción ordinaria en cobro de dinero acompañada del embargo del inmueble para asegurar el cumplimiento de la sentencia. Íd., pág. 292.

Asimismo, el procedimiento de ejecución hipotecaria posee naturaleza mixta, toda vez que incorpora elementos tanto de una acción real como de una acción personal. First Fed. Savs. v. Nazario *et als*., 138 DPR 872, 879 (1995). De esta manera, el acreedor puede optar entre instar una acción en cobro de dinero o promover una acción dirigida a ejecutar la garantía hipotecaria. First Fed. Savs. v. Nazario et als., *supra*, pág. 880. Finalmente, la acción de ejecución hipotecaria por

la vía ordinaria se encuentra regulada por las Reglas de Procedimiento Civil y la Ley del Registro de la Propiedad Inmobiliaria. BL Investment v. Registrador, 173 DPR 833, 841 (2008).

A esos fines, el Artículo 201 de la derogada Ley Núm. 198 de 8 de agosto de 1979, según enmendada, mejor conocida como la "Ley Hipotecaria y del Registro de la Propiedad" 30 LPRA sec. 2001 *et seq.,* establece que toda hipoteca vencida, ya sea total o parcialmente, así como los intereses adeudados, podrá ejecutarse judicialmente conforme a las disposiciones allí contempladas. 30 LPRA sec. 6131. Del mismo modo, dispone que los bienes hipotecados no responderán por costas y honorarios de abogado incurridos durante la reclamación judicial, salvo que dichas sumas hayan sido expresamente pactadas en la escritura de constitución de hipoteca. Asimismo, el procedimiento de ejecución hipotecaria debe dirigirse contra el titular registral del inmueble o sus causahabientes y, cuando la obligación garantizada consista en instrumentos negociables, será necesario cumplir con las disposiciones de la legislación mercantil aplicables a su cobro. 30 LPRA sec. 6133.

En términos generales, el trámite de ejecución inicia con la presentación de una demanda contra el titular registral del bien hipotecado o contra sus causahabientes. Como norma práctica, junto con dicha demanda suele solicitarse una anotación preventiva de demanda. Atanacia Corp. v. J.M. Saldaña, *supra*, pág. 293. Posteriormente, celebrado el juicio y notificada la sentencia correspondiente, el tribunal emite una orden de ejecución para que el alguacil lleve a cabo los procedimientos relacionados con la subasta del inmueble, previa notificación adecuada a las partes interesadas. 32 LPRA Ap. V, R. 51.7.

**III.**

En el presente caso, los Apelantes nos solicitaron la revocación de la *Sentencia Parcial Enmendada* mediante la cual se declaró "Ha Lugar" la "**Solicitud de Sentencia Sumaria**" presentada por PRAPI.

Por tratarse de un asunto de umbral, comenzaremos atendiendo el tercer señalamiento de error presentado por el matrimonio Leyva-Romero en el caso núm. TA2025AP00580, así como el único señalamiento de error planteado en el caso núm. TA2025AP00590. En esencia, estos sostienen que existe una ausencia de

parte indispensable debido a que la Sucesión Quiñones posee un interés directo sobre las hipotecas y pagarés objeto de la presente controversia. Veamos.

Tanto el matrimonio Leyva Romero como la Sucesión Quiñones alegan que existió un esquema de fraude en perjuicio del Sr. Veremundo Quiñones Mojica mientras este presuntamente se encontraba incapacitado física y mentalmente para administrar sus bienes. Particularmente, arguyen que la subordinación a segundo rango de los pagarés hipotecarios originalmente en primer rango, la cual permitió la constitución de la hipoteca a favor del BPPR y posteriormente de PRAPI, se realizó sin la comparecencia ni el consentimiento del señor Quiñones Mojica o de su Sucesión.

No obstante, dicho planteamiento no nos persuade. El Artículo 189 de la entonces vigente Ley Hipotecaria, *supra*, disponía expresamente los requisitos necesarios para la permuta o posposición de una hipoteca inscrita. 30 LPRA sec. 2606. Del referido Artículo no surge requisito alguno que exigiera la comparecencia personal del señor Quiñones Mojica para la validez de la subordinación hipotecaria más allá del consentimiento requerido, conforme al negocio jurídico correspondiente. Así, dicha disposición estatutaria lo único que requiere para hacer efectiva una permuta o posposición de rango de una hipoteca son los siguientes requisitos: (1) el consentimiento del acreedor que permute o haya de posponer mediante escritura pública; (2) el consentimiento de los acreedores posteriores o intermedios que surja del Registro de la Propiedad; (3) que se disponga la responsabilidad máxima de capital, intereses, costas u otros conceptos de la hipoteca futura cuyo rango se convertirá en superior; y (4) que la hipoteca que ha se anteponerse se inscriba dentro del plazo convenido. Íd.

Como podrá observarse de lo anterior, nuestro ordenamiento registral no exige el consentimiento del deudor o dueño del inmueble que afecta la garantía hipotecaria. Nótese que la controversia principal del presente caso versa sobre el cobro de dinero, la ejecución de hipoteca y las garantías personales reclamadas por PRAPI como sucesor del BPPR. Por ello, el foro *a quo* podía adjudicar las reclamaciones relacionadas con la deuda y las garantías sin que fuera indispensable la comparecencia de la Sucesión Quiñones en el pleito. En

consecuencia, concluimos que la ausencia de dicha sucesión no privaba al Tribunal de jurisdicción para atender las controversias ante su consideración.

Resuelto lo anterior, procedemos a atender los restantes señalamientos de error esgrimidos en el caso TA2025AP00580. Los errores 1, 2 y 4 se encuentran íntimamente relacionados, por lo que se abordarán de manera conjunta en la discusión. En esencia, el matrimonio Leyva-Romero sostiene que el TPI erró al: (1) dictar sentencia parcial sin adjudicar la "**Reconvención**" presentada por ellos; (2) al no emitir determinaciones de hechos en controversia que impedían disponer parcialmente del caso sumariamente y al (3) no validar la cancelación del pagaré hipotecario que, según su postura, extingue la obligación principal e impedía efectuar cualquier reclamación adicional. No nos convence su postura. Veamos.

Según adelantáramos, al momento de revisar una determinación del foro de instancia respecto a una solicitud de sentencia sumaria, estamos llamados a realizar una revisión de *novo* y limitarnos únicamente a adjudicar las controversias con los documentos que obran en el expediente ante el foro *a quo*. Al evaluar las determinaciones de hechos esbozadas por el foro primario, encontramos que los mismos no se encuentran en controversia por estar basados en evidencia suficiente.

Como consecuencia, acogemos las determinaciones de hechos detalladas en el dictamen apelado como nuestras:

1. El BPPR y Mayer, por conducto de José Miguel Del Valle López, suscribieron un "Financial Agreement" el 30 de enero de 2007.

2. El BPPR concedió a Mayer un financiamiento mediante una línea de crédito rotativa hasta $16,000,000.00 con expiración el 15 de diciembre de 2008, con intereses a razón de una tasa fluctuante equivalente a 0.50% sobre la tasa de interés vigente para préstamos comerciales de los principales bancos de Estados Unidos, según publicada por el *Wall Street Journal* (en adelante, "Tasa Primaria"), y en caso de mora, a razón de una tasa de interés equivalente a doscientos puntos básicos sobre la tasa primaria.

3. Para evidenciar la deuda, Mayer suscribió un Pagaré Operacional a la orden del BPPR por un principal de $16,000,000.00 autenticado mediante testimonio 5,401 ante el notario Gustavo J. Umpierre Pontón.

4. Conforme el Pagaré Operacional, y como garantía, Mayer entregó mediante un "Pledge Agreement" (en adelante, "Contrato de Prenda"), a BPPR el Pagaré Hipotecario vencedero a la presentación, devengando intereses a razón de una tasa fluctuante equivalente a doscientos puntos básicos sobre la tasa de interés publicada por periódicos de circulación general, como

el *Wall Street Journal*, como la tasa vigente para préstamos comerciales otorgados por los principales bancos de Estados Unidos y autenticado mediante testimonio número 5,402 ante el notario Gustavo J. Umpierre Pontón.

5. El 30 de enero de 2007, se otorgó un documento titulado "Mortgage Note" (en adelante, "Pagaré Hipotecario") como garantía adicional para las obligaciones del contrato de financiamiento.

6. El Pagaré Hipotecario está garantizado, a su vez, por una hipoteca sobre la finca 8497 constituida mediante escritura pública número 6 ante el notario Gustavo J. Umpierre Pontón.

7. La finca 8497 fue tasada en 16,000,000.00 para fines de una primera subasta en caso de ejecución. La escritura de hipoteca fue inscrita al asiento 776 del diario 234 del Registro de la Propiedad de Carolina, Sección III.

8. La Finca 8497 está descrita registralmente como sigue:

   RÚSTICA: Finca conocida por el nombre de Casablanca con una cabida superficial de cuarenta y uno cuerdas con cuatro mil setecientos noventa y dos diez milésimas de otro (41,4792 cdas), equivalentes a ciento sesenta y tres mil cero veintinueve punto ochenta y cuatro metros cuadrados (163,029.84 mc), radicada en el Barrio Mediania Baja del término municipal de Loíza, Puerto Rico. En lindes: por el NORTE, con terrenos de la zona marítimo terrestre; por el SUR, con terrenos propiedad de Monserrate Flores, Roberto González Flores, Sucesión Juana Moreno, Susana Moreno, Sucesión Pizarro, Sucesión Ramos, Sucesión Patrona Dávila y la Carretera Estatal Número Ciento Ochenta y Siete (187); por el ESTE, con la parcela segregada; por el OESTE, con terrenos pertenecientes a la. Sucesión Esteban Ferrer.---------

   ---Inscrita al folio 35 del tomo 218 ágora de Loíza, Registro de la Propiedad de Carolina, Sección 111.--------------------------------------

9. Como parte de la colateral en garantía, el 30 de enero de 2007, Mayer otorgó un "Collateral Assingment of Contracts, Rights and Documents" autenticado mediante testimonio 5,405 ante el notario Gustavo J. Umpierre Pontón. Mediante dicho documento, Mayer cedió sus derechos, titularidad e intereses en todos los contratos, derechos y documentos relacionados con el proyecto de vivienda conocido como Marazul, incluyendo, pero sin limitarse, planos, permisos, licencias, marcas y pólizas de seguro.

10. El 30 de enero de 2007, Mayer otorgó un "Collateral Assignment of Binding Option or Sale" mediante el cual crearon gravámenes sobre todos sus derechos, titularidad e interés en los contratos de opción y acuerdos de ventas de las unidades que conforman el proyecto.

11. Además, Mayer suscribió una Declaración de Financiamiento gravado los contratos, derechos y documentos relacionados con el proyecto de vivienda Marazul.

12. El 30 de enero de 2007, Del Valle-Rodríguez, Leyva-Romero, Massó-Maldonado, Massó-Estévez, suscribieron una Garantía Ilimitada y Continua autenticada por el notario Pedro J. Díaz García garantizado solidariamente el pago de la deuda de Mayer con el BPPR.

13. La Garantía Ilimitada y Continua estableció que los firmantes garantizaban el pago puntual de cualquier deuda que pudiese tener Mayer con el BPPR, su sucesor o cesionario.

14. Adicionalmente, la Garantía Ilimitada y Continua establece que los firmantes, en caso de incumplimiento que resulte, entre otros, en venta judicial, vendrán obligados a pagar la deficiencia del producto de tal venta judicial.

15. El financiamiento a favor de Mayer expiró el 15 de diciembre de 2008. No obstante, el BPPR comenzó negociaciones para atender los incumplimientos y la deuda de Mayer, incluyendo acuerdos de restructuración.

16. BPPR llevó a cabo gestiones para atender la deuda de Mayer hasta mayo de 2010. Sin embargo, no pudieron concretar un acuerdo.

17. Al 6 de mayo de 2010, las demandadas adeudaban una suma consolidada de $6,824,991.44, compuesto por $6,216,327.97 de principal y $608,663.47 de intereses acumulados, más el interés diario el cual se acumula hasta el saldo total.

18. Mayer se obligó a pagar una suma pactada de $1,600,000.00 para costas, gastos y honorarios de abogado en caso de reclamación judicial o ejecución de hipoteca, así como de aquellos gastos, costas e intereses legales posteriores a la sentencia que se acumulen hasta el cobro de dicha deuda, incluyendo honorarios de abogado.

19. PRAPI es el portador y/o tenedor por endoso de los pagarés hipotecarios y otros documentos de colateral y acreedor prendario de los demandados.

20. El financiamiento a favor de Mayer expiró el 15 de diciembre de 2008.

21. El 20 de septiembre de 2011, se presentó una Estipulación de desistimiento voluntario entre Banco Popular de Puerto Rico, el matrimonio Massó-Maldonado, el matrimonio Massó-Estévez y Blue Sea Village.

22. La deuda fue declarada vencida, líquida y exigible.

23. La Sentencia Parcial emitida por el TPI el 8 de mayo de 2018, dispuso, además, que "[e]n defecto del pago de las sumas adeudadas antes descritas, advenida final y firme la sentencia, se ordene la ejecución simultánea de prendas, hipotecas, gravámenes y garantías, para que aquellos bienes gravados sean ejecutados y vendidos en pública subasta al mejor postor, y libre de gravámenes subsiguientes para satisfacer las sumas adeudadas a PRAPI. Específicamente, sin que se entienda como una limitación a la ejecución del restante de la colateral, en defecto del pago de las sumas adeudadas antes descritas, advenida final y firme la sentencia, se ordene la ejecución simultánea de prendas e hipotecas relacionadas a la Finca 8497, cuyo tipo mínimo para la subasta será de $1 6,000,000.00".

24. La propiedad que garantizaba la deuda fue vendida en pública subasta y se abonó a la deuda $8,000,000.00.

25. Tras la venta en pública subasta y el abono a la deuda de $8,000,000.00, quedó una deficiencia de $7,158,672.00 más intereses diarios, además de una suma de $1,600,000.00

pactados por concepto de costas, gastos y honorarios de abogado.

26. La cantidad adeudada a la fecha de la solicitud de sentencia sumaria totalizaba $8,158,672.00 y se compone de $4,662,858.00 de principal, $2,495,814.00 de intereses acumulados, más la suma de $1,600,000.00 para costas, gastos y honorarios de abogado que Mayer se obligó a pagar en caso de reclamación judicial o ejecución de hipoteca. La cantidad adeudada continúa acumulando intereses diarios hasta el saldo de la deuda.

Conforme adelantáramos en los acápites anteriores, en nuestro ordenamiento jurídico procede dictar sentencia sumaria si conforme a la evidencia presentada, no existe controversia real y sustancial en cuanto a hechos esenciales y pertinentes del caso. 32 LPRA, Ap. V, R. 36.3. Un hecho material es aquel que tiene el potencial de impactar el resultado de la reclamación. Oriental Bank v. Caballero García, *supra*, pág. 679. Para ello, el Tribunal debe tener a su disposición todos los hechos necesarios para resolver la controversia. Íd., pág. 678. Esto es, un tribunal no puede disponer de un caso por la vía sumaria cuando existan hechos fundamentales controvertidos. SLG Szendrey-Ramos v. Consejo de Titulares, *supra*, pág. 168.

En el presente caso, el matrimonio Leyva-Romero sostiene que el TPI no atendió la "**Reconvención**" presentada al emitir la *Sentencia* del 18 de julio de 2024, posteriormente enmendada el 20 de octubre de 2025. Asimismo, alegan que existían controversias relacionadas con: (1) el alegado incumplimiento del banco al no desembolsar fondos previamente certificados; (2) la diferencia entre el término de financiamiento aprobado y el término finalmente consignado en el contrato; (3) la suspensión unilateral de desembolsos por parte del BPPR; (4) las instrucciones alegadamente inconsistentes impartidas por el banco que provocaron modificaciones al proyecto; y (5) los daños económicos que, según sostienen, fueron ocasionados por la propia actuación del acreedor.

Tras analizar detenida y comprensivamente los documentos que obran en el expediente, incluyendo la "**Solicitud de Sentencia Sumaria**", su correspondiente *Oposición* y la *Sentencia Parcial Enmendada*, hemos arribado a la conclusión de que no se cometieron los errores señalados. Nos explicamos.

De entrada, no nos persuade el planteamiento del matrimonio Leyva Romero respecto a que el foro de instancia incidió al no adjudicar la "**Reconvención**" presentada por estos. La determinación apelada constituye una sentencia parcial

emitida conforme la Regla 42.3 de Procedimiento Civil, 32 LPRA Ap. V, R. 42.3, dirigida específicamente a resolver la reclamación de PRAPI relacionada con el cobro de la deficiencia resultante luego de la venta judicial y la responsabilidad de los garantizadores personales. De hecho, surge claramente de la propia *Sentencia Parcial Enmendada* que las reconvenciones permanecían pendientes y que el BPPR continuaría en defensa de estas. Por ello, no existía obligación de atender dichas reclamaciones en esta etapa de los procedimientos para disponer sumariamente de la controversia en cuestión. Nuestro ordenamiento procesal permite que el Tribunal disponga de distintas controversias planteadas o de controversias entre múltiples partes, por medio del mecanismo consignado en dicha Regla.

Superado lo anterior, tampoco nos convencen los restantes planteamientos esbozados por el matrimonio Leyva-Romero relacionados con alegados incumplimientos del BPPR. Del expediente surge incontrovertido que el BPPR y Mayer suscribieron un acuerdo de financiamiento mediante una línea de crédito rotativa de hasta $16,000,000.00 garantizada mediante múltiples instrumentos colaterales y garantías personales solidarias suscritas por los aquí Apelantes. Igualmente, surge del expediente que el financiamiento venció el 15 de diciembre de 2008 y que el BPPR realizó gestiones y negociaciones para atender la deuda y los incumplimientos de Mayer hasta mayo de 2010. Finalmente, la deuda fue declarada líquida, vencida y exigible.

Asimismo, la prueba documental demuestra que los Apelantes suscribieron una "**Garantía Ilimitada y Continua**" mediante la cual garantizaron solidariamente el pago de la deuda y cualquier deficiencia resultante de una eventual venta judicial del colateral. Posteriormente, la propiedad hipotecada fue vendida en pública subasta y, aun luego de acreditarse los $8,000,000.00 al balance adeudado, subsistió una deficiencia por la cual PRAPI reclamó el pago correspondiente.

Así pues, los planteamientos de los Apelantes relacionados con los alegados incumplimientos del BPPR no son suficientes para alterar las determinaciones alcanzadas por el foro de instancia. Las controversias invocadas con respecto a desembolsos, modificaciones al proyecto y alegados daños económicos no cambian la realidad de que del expediente surge claramente la existencia de

contratos válidos y exigibles, una deuda líquida, vencida y exigible, así como garantías personales mediante las cuales los Apelantes se obligaron solidariamente a responder por cualquier deficiencia resultante luego de la ejecución del colateral.

En suma, concluimos que el TPI actuó correctamente al disponer sumariamente de la reclamación presentada por PRAPI respecto a la deficiencia adeudada y la responsabilidad de los garantizadores personales.

Como ultimo señalamiento de error esgrimido, el matrimonio Leyva-Romero sostiene que el foro *a quo* erró al no considerar la aplicación de la doctrina *rebus sic stantibus* y la buena fe contractual ante el incumplimiento previo del acreedor. No le asiste la razón. Nos explicamos.

En el caso de autos, los Apelantes sostienen que el BPPR incurrió en actuaciones relacionadas con desembolsos, modificaciones al proyecto y manejo del financiamiento que alegadamente afectaron el desarrollo del proyecto Marazul. Sin embargo, tales planteamientos no satisfacen los criterios estrictos requeridos para la aplicación de la doctrina de *rebus sic stantibus*. Del expediente no surge la ocurrencia de un evento extraordinario, imprevisible y ajeno a las partes que transformara radicalmente las obligaciones contractuales asumidas. Por el contrario, surge claramente que las partes suscribieron libremente múltiples contratos de financiamiento y garantías personales relacionados con un préstamo comercial de gran magnitud, asumiendo los riesgos inherentes a dicho tipo de negocio.

Asimismo, el expediente demuestra que, aun luego del vencimiento del financiamiento en diciembre de 2008, el BPPR realizó gestiones y negociaciones dirigidas a atender la deuda y los incumplimientos de Mayer hasta mayo de 2010. Por consiguiente, no puede sostenerse que el acreedor actuó arbitrariamente o en contravención al principio de buena fe contractual.

Resolver lo contrario implicaría convertir la doctrina de *rebus sic stantibus* en un mecanismo ordinario para alterar contratos comerciales válidamente perfeccionados cada vez que una de las partes alegue dificultades económicas o desacuerdos relacionados con el manejo del financiamiento. Ello resulta claramente incompatible con el principio de *pacta sunt servanda*, el cual dispone

que las obligaciones contractuales tienen fuerza de ley entre las partes y deben cumplirse conforme a sus términos. Por consiguiente, concluimos que el TPI actuó correctamente al rechazar la aplicación de la doctrina de *rebus sic stantibus* en el presente caso.

Habiendo resuelto lo anterior, procede atender los señalamientos de error planteados en el caso núm. TA2025AP00579, los cuales discutiremos conjuntamente por encontrarse estrechamente relacionados. En síntesis, el matrimonio Del Valle-Rodríguez sostiene que el TPI erró al: (1) dictar sentencia a favor de PRAPI, aun cuando alegadamente este había desistido previamente de sus reclamaciones contra la Sucesión Del Valle; (2) al concluir que los Apelantes continuaban respondiendo bajo la "**Garantía Ilimitada y Continua**" pese a la ejecución y adjudicación del colateral; y al (3) interpretar dicha garantía como una renuncia amplia a las protecciones del fiador, aun cuando, según alegan, se trataba de un contrato de adhesión sujeto a interpretación restrictiva. Tampoco nos convence su postura.

Primeramente, en cuanto al planteamiento relacionado con el alegado desistimiento, del expediente surge que dicho asunto únicamente fue recogida mediante una *Minuta-Orden* y no se recogió a través de una sentencia final que dispusiera formal y definitivamente de las reclamaciones instadas contra el matrimonio Del Valle-Rodríguez.

A esos efectos, la Regla 39.1 de Procedimiento Civil dispone que un desistimiento por orden del tribunal requiere una determinación formal mediante la cual se disponga de las reclamaciones correspondientes. 32 LPRA Ap. V, R. 39.1. Del expediente no surge la existencia de una sentencia final y firme que archivara o diera por desistida de manera definitiva las causas de acción presentadas contra el referido matrimonio. En nuestro estado de derecho procesal, el único mecanismo para disponer finalmente y/o poner fin a las controversias o asuntos planteados entre partes lo es la sentencia. Una minuta-orden o una resolución no tienen el mismo efecto jurídico, ni puede interpretarse que tiene el mismo alcance legal. En consecuencia, no les asiste la razón a los Apelantes al sostener que el foro *a quo* carecía de jurisdicción para adjudicar las reclamaciones presentadas en su contra.

Por otro lado, del expediente surge claramente que los apelantes suscribieron una "**Garantía Ilimitada y Continua**" mediante la cual se obligaron solidariamente a responder por las obligaciones contraídas por Mayer con el BPPR, incluyendo cualquier deficiencia que resultara luego de la venta judicial del colateral. La propia garantía establecía expresamente que los firmantes responderían por cualquier balance insoluto que permaneciera pendiente luego de la ejecución de las garantías hipotecarias y prendarias. Por ello, el mero hecho de que la propiedad hipotecada fuera ejecutada y adjudicada en pública subasta no tuvo el efecto de extinguir automáticamente la totalidad de la obligación, ni de relevar a los garantizadores de las obligaciones asumidas contractualmente. Sobre este particular, debemos enfatizar en la naturaleza accesoria de cualquier garantía hipotecaria, la cual, subsiste mientras esté vigente la deuda principal y no al revés como se intima en los recursos de epígrafe. El hecho de que se haya ordenado la ejecución de la hipoteca, la venta judicial y se confirmara esta última, no implica que la deuda principal garantizada dejara de existir o ser vigente o que la garantía solidaria otorgada sobre dicha deuda principal se extinguiera; más aún cuando quedó demostrado que con lo obtenido de la venta del colateral no fue suficiente para sufragar la deuda en su totalidad.

Asimismo, del texto de la "**Garantía Ilimitada y Continua**" no surge cláusula abusiva alguna que requiera la anulación del contrato por tratarse alegadamente de un contrato de adhesión. Muy por el contrario, del expediente surge que los Apelantes suscribieron voluntariamente múltiples documentos relacionados con un financiamiento comercial de gran magnitud, incluyendo garantías personales solidarias claramente redactadas y dirigidas a asegurar el cumplimiento de las obligaciones asumidas por Mayer. De igual forma, las cláusulas relacionadas con la responsabilidad por deficiencia luego de la venta judicial surgen expresamente del propio contrato de garantía. En otras palabras, al examinar los documentos que obran en autos, notamos que no existe ambigüedad u obscuridad alguna en el contrato en controversia. Así pues, al ser esa la realidad que presenta el caso de autos, el mismo debe ser comprendido y analizado, según sus términos establecidos.

En suma, somos de la opinión de que procede el cobro de la deficiencia reclamada por PRAPI, toda vez que del expediente surge claramente la existencia de obligaciones válidas y exigibles, así como garantías personales mediante las cuales los Apelantes se obligaron solidariamente a responder por cualquier balance insoluto resultante luego de la ejecución y venta judicial del colateral.

Procede, por tanto, confirmar el dictamen apelado en todos sus términos.

**IV.**

Por los fundamentos que anteceden, los cuales hacemos formar parte integral del presente dictamen, *confirmamos* la *Sentencia* apelada.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones